IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 7, 2017

**STATE OF TENNESSEE v. DANIEL NESBIT**

**Appeal from the Criminal Court for Shelby County**
**No. 13-02659      James M. Lammey, Judge**

_____

**No. W2016-00492-CCA-R3-CD**

_____

Defendant, Daniel Nesbit, was indicted for felony murder and attempted especially aggravated robbery for his role in the shooting death of the victim, Jernario Taylor. After a jury trial, Defendant was convicted as charged and sentenced to an effective sentence of life imprisonment. Defendant appeals, arguing that: (1) the trial court erred in granting the State a continuance over the objection of defense counsel; (2) the State failed to disclose exculpatory evidence; (3) the trial court erred by admitting a recording of a telephone call between the co-defendant and his girlfriend; (4) the trial court erred by failing to grant a mistrial; (5) the trial court erred by allowing the State to argue inconsistent theories; (6) the trial court erred by admitting evidence of Defendant's arrest in Alabama; (7) the evidence was insufficient to support the convictions; (8) the trial court erred by failing to disclose a note received from the jury during deliberations; and (9) cumulative error necessitates a reversal of Defendant's convictions. Having carefully reviewed the record before us and the briefs of the parties, we find no error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Gregory D. Allen (on appeal), and Paul J. Springer (at trial), Memphis, Tennessee, for the appellant, Daniel Nesbit.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glenn Baity and Bryce Phillips, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Facts**

Mallorie Brown lived at the Sundridge Apartments in Memphis with Jernario Taylor, the victim; their daughter, Jenaria Taylor; and Tarkeisha Jones. The victim often sold marijuana out of the apartment. In the evening hours of August 7, 2012, Ms. Brown was giving her child a bath upstairs. The victim was downstairs in the living room at the time with Ms. Jones. The victim had about eight to ten bags of marijuana with "two blunts [4 to 5 grams each] in each bag."

Ms. Brown came downstairs and went into the kitchen to wash her child's cup out in the kitchen sink. She was able to see the victim and Ms. Jones in the living room when she came down the steps. While she was in the kitchen she "heard one shot." Ms. Brown ran out of the kitchen into the hallway where she saw the victim "laying out on the floor [by the front door] and [Ms. Jones running] out the back door." Ms. Brown also saw two men. She later identified the men as Defendant and Brandon Taliaferro, the codefendant. Mr. Taliaferro was "[s]tanding by [the victim] pointing a gun to him." Defendant "jacked" Ms. Brown up, asking "[b]itch, where the money at?" Ms. Brown saw a black gun in Defendant's hand, possibly a 9 mm "or something like that." Ms. Brown struggled with Defendant before she "ran up under him and ran out the back door and called 911" from someone else's house. Ms. Brown's baby was still inside the apartment.

The victim died of a gunshot wound to the back that entered around the spine, cracked a rib and penetrated the right lung before exiting the right abdomen. Fingerprints found in the apartment matched Mr. Taliaferro and Ms. Jones.

Ms. Brown described Defendant as having a light complexion and thought that he was around five feet, eight inches tall and probably weighed 180 pounds. Ms. Brown described Defendant as wearing a white T-shirt, black shorts, white tennis shoes, and was "bowlegged." At trial, Ms. Brown admitted that Defendant was not light-skinned or bowlegged. Ms. Brown first agreed that she did not identify Defendant in a photographic lineup as the perpetrator until approximately one month later but then claimed that she identified Defendant the day after the incident. She admitted that she searched online for a story about the victim's death, saw a picture of Defendant with Mr. Taliaferro, and called the police to tell them that Defendant was the other perpetrator. Ms. Brown admitted that she had prior convictions for theft, forgery, and identity theft.

Ms. Jones testified at trial that she was in the living room with the victim and that she saw Mr. Taliaferro come into the apartment and ask for marijuana. Mr. Taliaferro

"grabbed the candle off the table . . . and tried to light the cigarette." Ms. Jones told him that they "didn't smoke cigarettes in the house." Mr. Taliaferro put the candle down; the victim reached into his own pocket and gave him a lighter. Mr. Taliaferro "grabbed the lighter on his way out the front door." Ms. Jones asked the victim if he could get her lighter back from Mr. Taliaferro. When the victim "reached out to get the lighter" another man came into the apartment. A third man was "standing outside holding a gun" that looked like an "AK" or an assault rifle. Ms. Jones did not see Mr. Taliaferro with a gun. Ms. Jones ran out of the back door and hid behind a tree.

In a statement given to police in close proximity to the incident, Ms. Jones stated that she was:

> [I]n the living room [with the victim]. His phone rung. Five minutes later [Mr. Taliaferro] came in. He bought a blunt and he left. Like five minutes later Mallorie came down the stairs and I don't know what [the victim's] response was. [Mr. Taliaferro] said they sent me back over here give me a bag of this shit.
>
> That's when he asked for the lighter. He reached for the candle on the table. I told him we don't smoke in the house. [The victim] got up and - - to get the lighter. The suspect walked out of the front door and said I appreciate that and that's when I got up and headed to the kitchen to get a cigarette. On my way to get a cigarette I asked [the victim] to get my lighter from the suspect.
>
> I turned around and saw [the victim] at the front door and all three suspects were trying to force their way in. When I heard give me the money bruh I ran toward the back door and I heard the guy say go get that bitch and that's when I heard a gunshot.
>
> I ran out the back door and heard Mallorie saying I don't have any money.

Ms. Jones admitted that she did not give the police her real name at the time the murder was reported because she had an outstanding warrant for a violation of probation on a theft conviction. Ms. Jones initially described Defendant as five feet, eight or nine inches tall, "brown skinned, medium complexion," with a low haircut. Ms. Jones told police that night that he was wearing a white t-shirt and red shorts. At trial, she testified that Defendant was wearing black shorts with red trim on the night of the incident. Ms. Jones admitted that she was able to identify Mr. Taliaferro from a photographic lineup and claimed that she was never asked to identify anyone else. Ms. Jones saw

Defendant's picture on the news about one month after the incident. This was when she recognized Defendant as the other perpetrator. Ms. Jones denied that she was called back to the police station to identify Defendant.

Javarious Douglas, a twelve-year old boy, was riding his bike with a friend on the night of the incident in front of the apartment building. Mr. Douglas saw two men running. He observed a white Pontiac G6 circling the apartments. The two men caught up to the car and got in it before it drove away. Mr. Douglas described one of the men as having dreadlocks.

Mr. Taliaferro's girlfriend, Detricia Peeples, drove a white Pontiac G6 at the time of the incident. She confirmed that Mr. Taliaferro borrowed her vehicle on August 7, 2012, to go to Dyersburg to meet his uncle and pick up some money. Mr. Taliaferro picked up the vehicle that night and returned it the next morning. When he returned the vehicle to Ms. Peeples, he was accompanied by Defendant.

Several days later, Ms. Peeples gave a statement to police. She informed police that Mr. Taliaferro called her on the afternoon of August 8 to tell her to watch the news. When she saw the news story about the murder and heard a description matching her vehicle and Mr. Taliaferro, she was concerned that her vehicle was involved in the victim's death. Mr. Taliaferro called Ms. Peeples again; this time she recorded the telephone call. During the call, Mr. Taliaferro threatened Ms. Peeples and told her that he and Defendant committed the crime.

Defendant was eventually apprehended nearly eight months later at an apartment in Phenix City, Alabama by a fugitive apprehension unit. During the arrest, a single gunshot coming from the residence was heard by Sergeant Gregory Lahr. After the gunshot, Sergeant Lahr heard the "cycling of a weapon" and what sounded like cartridges hitting the floor. Defendant put up a struggle; officers had to use a Taser to subdue Defendant. A search of the apartment revealed a 9mm handgun, a bullet hole through the doorframe of the bathroom, a bullet on the floor of the bathroom, several cartridges on the floor, and one spent shell casing. The parties stipulated at trial that the weapon recovered in Phenix City did not fire the cartridge recovered by Memphis police in the shooting of the victim.

Defendant did not testify at trial. Lashanda Houston, one of Defendant's former girlfriends, testified that she was dating Defendant at the time of the incident. In fact, Ms. Houston claimed that Defendant was living with her at the time. Ms. Houston had a yellow Pontiac coupe in August 2012. On the night of the incident, Defendant borrowed her car. Ms. Houston went to bed around 7:00 p.m. She claimed that she was awakened

by officers around 11:00 p.m. asking her about a confrontation between Defendant and his uncle.

At the conclusion of the proof, the jury found Defendant guilty of the charges as stated in the indictment. As a result, Defendant was immediately sentenced to life imprisonment for the felony murder conviction. After a sentencing hearing, the trial court sentenced Defendant to a concurrent sentence of ten years for the attempted especially aggravated robbery conviction. Defendant filed a timely notice of appeal.

**Analysis**

*Continuance*

Prior to trial, the State sought and was granted a continuance on the basis that Ms. Peeples was pregnant. Defendant now complains about the ex parte nature of the grant of the continuance.

The decision whether to grant or deny a continuance rests within the sound discretion of the trial court. *State v. Morgan*, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). If a Defendant is prejudiced, and the trial court abused its discretion in granting a continuance, the trial court's decision may be reversed. *Id.* In this case, the trial court granted a continuance because Ms. Peeples, a key State witness, was pregnant. While the State concedes that the better practice would be for the trial court to avoid ex parte communications and rulings, we agree, and add that attorneys must avoid such ex parte communications. The continuance granted herein did not amount to unfair prejudice against Defendant or a bias in favor of the State. Defendant knew that Ms. Peeples was a scheduled witness and that she was expecting a child. Defendant has failed to show that he was prejudiced by the continuance and, therefore, is not entitled to relief on this issue.

*Alleged Brady Violation/Prosecutorial Misconduct*

Defendant alleges that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), in several different ways and that the violations amounted to prosecutorial misconduct. First, Defendant argues that the State erred by failing to disclose exculpatory statements by Ms. Brown prior to trial. Specifically, Defendant argues that the State withheld Ms. Brown's identification of the perpetrator as bowlegged and light-skinned. Defendant also claims that the State withheld information about the testimony of a fugitive apprehension officer from Alabama until the day of trial. The State, on the other hand, disagrees, arguing that the evidence does not qualify as *Brady* material and that the trial court repeatedly offered Defendant a continuance in order to prepare for the introduction of the evidence at trial. Defendant also argues in his brief that the State committed a *Brady*

violation and prosecutorial misconduct because "Ms. Tarkeisha Jones gave a false name and was actually someone different from Ms. Theus." Defendant's brief does not contain either an argument with respect to this issue or citation of authority to support Defendant's assertion that this amounted to either a *Brady* violation and/or prosecutorial misconduct. Therefore, this issue is waived. *See* Tenn. R. Crim. P. 10(b).

Prior to trial, Defendant complained that the State failed to provide certain information in accordance with *Jencks v. United States*, 353 U.S. 657 (1957). Defendant argued that Ms. Brown was the only person who could identify him as the perpetrator and her description of Defendant as a light-skinned, bowlegged, black man was not consistent with Defendant's physical description and, therefore, was exculpatory evidence. Additionally, Defendant argued that the State withheld the name of the law enforcement officer from Alabama who would be testifying about the circumstances of Defendant's arrest, thereby depriving Defendant of an opportunity to investigate the matter. When Defendant objected, the trial court offered a continuance in order to give Defendant an opportunity to investigate whether a bowlegged man existed and to look into the testimony of the Alabama officer. Defense counsel declined and continued to argue about the State's actions. The trial court offered Defendant a continuance approximately seven times and each time, defense counsel declined. The State informed the trial court that it was unaware of the identity of the officer from Alabama until October 21, five days prior to trial. The trial court opined that the actual identity of the officer was irrelevant, as any officer present during Defendant's Alabama arrest could testify that he was resisting arrest. The trial court determined that the State did not act in bad faith.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to establish a due process violation under *Brady*, four prerequisites must be met: (1) the defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not); (2) the State must have suppressed the information; (3) the information must have been favorable to the accused; and (4) the information must have been material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Johnson v. State*, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (Mass. 1978)). Evidence is deemed material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *See United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is "a

probability sufficient to undermine confidence in the outcome." *Id.* at 682. The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. *Edgin*, 902 S.W.2d at 389. *Brady* does not require the prosecution "to disclose information that the accused already possesses or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Rule 26.2 of the Tennessee Rules of Criminal Procedure, also known as Tennessee's version of the *Jencks Act*, states in pertinent part:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Tenn. R. Crim. P. 26.2(a). Pursuant to Rule 26.2, the State has no duty to provide a defendant with a copy of a witness's statement until after the witness has testified on direct examination. *State v. Caughron*, 855 S.W.2d 526, 535 (Tenn. 1993) (citing *State v. Taylor*, 771 S.W.2d 387, 394 (Tenn. 1989)).

Prior to trial, Defendant requested exculpatory evidence from the State. The State turned over a witness list, which Defendant received. The list contained the name of every State witness with the exception of Sergeant Lahr. Now, on appeal, Defendant claims that the failure to disclose the identity of Sergeant Lahr prevented Defendant from developing his defense. Additionally, Defendant claims that the State failed to disclose the police report containing Ms. Brown's description of the suspect.

In our view, Defendant's *Brady* claim fails with respect to the testimony of both Ms. Brown and Sergeant Lahr, albeit for different reasons. With respect to the testimony of Sergeant Lahr, the testimony did not qualify as *Brady* material because nothing about the testimony was exculpatory. Moreover, Defendant was presumably present for his own arrest in Alabama and could have related information about it to his trial counsel, aiding in the presentation of his own defense. With respect to the testimony and description of the perpetrator by Ms. Brown, we agree with Defendant that the information is indeed *Brady* material. The description given by Ms. Brown was exculpatory and the State was required to disclose Ms. Brown's statement prior to her testimony as the description of the perpetrator was in a typewritten statement to police. *See* Tenn. R. Crim. P. 26.2(a). The State turned the statement over to Defendant just prior to Ms. Brown's testimony. However, Defendant has failed to show prejudice. In the case of delayed disclosure of exculpatory evidence, a potential *Brady* violation may

be cured by the defendant's failure to move for a continuance after receiving the information, the defendant's thorough cross-examination of the witness regarding the evidence, or by the defendant's failure to call or recall an available witness concerning the exculpatory statements. *Caughron*, 855 S.W.2d at 548 (citing *United States v. Ingraldi*, 793 F.2d 408 (1st Cir. 1986)); *State v. Jerry Carney*, No. M1999-01139-CCA-R3-CD, 2000 WL 1335770, at *5 (Tenn. Crim. App. Sept. 15, 2000), *perm. app. denied* (Tenn. Apr. 24, 2001). The trial court herein repeatedly offered Defendant a continuance in order to cure any potential prejudice. Defendant repeatedly declined. He cannot now complain that he was prejudiced because of his own failure to take advantage of a method the trial court offered to correct the *Brady* violation. Defendant is not entitled to relief on this issue.

*Admission of a Recorded Telephone Call*

Defendant complains that the trial court improperly admitted a recording of a telephone call made by Mr. Taliaferro to Ms. Peeples because it was hearsay. The State disagrees.

Prior to trial, defense counsel argued that a recording of a telephone call between Mr. Taliaferro and his girlfriend, Ms. Peeples, two days after the crime was not admissible as a statement in furtherance of a conspiracy. The trial court disagreed, determining that the call was admissible because Mr. Taliaferro implicated himself, and the threats made against Ms. Peeples to keep silent about the incident were made in furtherance of a conspiracy. The trial court determined that the part of the recording in which Mr. Taliaferro implicated only Defendant were self-serving and, therefore, inadmissible.

At trial, defense counsel again objected to the introduction of the recorded call as hearsay. After listening to the recording, the trial court determined that any reference in the call solely implicating Defendant could not be played. During Ms. Peeples's testimony and the playing of the recording, the State asked her to interpret a portion of the recording. She testified that "[h]e said that [Defendant] did it all because of him." Defendant objected, asking for a mistrial. The trial court indicated that it was inclined to "let the whole thing in to begin with" and expressed no problem with the admission of the portion of the recording in which Mr. Taliaferro stated that "me and [Defendant]" committed the offense, but made clear that the statement "[Defendant] did it" was inadmissible. The trial court issued a curative instruction, telling jurors to strike their notes on the matter and that the State was going to begin the direct examination anew.

Our resolution of this issue is prevented by the inadequacy of the technical record on appeal. Neither the recording nor the remainder of the exhibits appears in the

technical record. It is the duty of the appellant to prepare an adequate record for our review. *See* Tenn. R. App. P. 24(b); *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). In the absence of an adequate record, we must presume that the trial court's ruling was correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Defendant is not entitled to relief on this issue.

*Mistrial*

In a somewhat related issue, Defendant claims that the trial court should have granted a mistrial after it ordered that the State was prohibited from presenting evidence that Mr. Taliaferro told Ms. Peeples that Defendant was responsible for the crimes, and Ms. Peeples testified exactly to what she was prohibited from saying. The State disagrees.

A mistrial is a procedural device through which the court stops the trial, discharges the jury, and holds a new trial with a new jury to determine the defendant's guilt. *See State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). A mistrial is declared in order "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Welcome*, 280 S .W.3d 215, 222 (Tenn. Crim. App. 2007). Only manifest necessity justifies the declaration of a mistrial, and the defendant bears the burden of showing manifest necessity. *State v. Williams*, 929 S.W .2d 385, 388 (Tenn. Crim. App. 1996). A mistrial is appropriate where a trial cannot continue, or the trial's continuation would be a miscarriage of justice. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). The decision to grant a mistrial rests in the sound discretion of the trial court, and the trial court's decision will not be overturned on appeal absent an abuse of discretion. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). In determining whether the trial court has abused its discretion, an appellate court considers: (1) whether the State elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the State's proof. *Welcome*, 280 S.W.3d at 222.

Looking to the factors, in our view it is not clear from the record whether the State elicited the testimony because, as noted previously, the actual recording of the telephone call is not a part of the record. Moreover, without listening to the recording, it appears that Ms. Peeples was asked to interpret a portion of the recording and interpreted Mr. Taliaferro's comments differently than the State expected. In other words, the State may not have elicited the testimony. However, the record is clear that the trial court gave a curative instruction and that, as discussed further below, the proof against Defendant was overwhelming. Defendant has failed to show that manifest necessity justified the grant of a mistrial. The trial court did not abuse its discretion. Defendant is not entitled to relief on this issue.

*Inconsistent Theories*

Defendant insists that the State was improperly allowed to argue inconsistent theories with regard to his whereabouts at the time of the incident. Specifically, Defendant is referring to an attempted homicide that occurred on the same day as the victim's murder. Additionally, Defendant complains that he was prevented from introducing evidence of his acquittal on this other charge at his trial for the victim's murder. The State concedes that Defendant was indicted for an attempted homicide that allegedly occurred one hour prior to the murder of the victim. The State also concedes that it was argued during the trial on the attempted homicide charge that Defendant was in a different location. However, the State disagrees that these were alternative theories.

Generally, the admission of evidence at trial is entrusted to the broad discretion of the trial court, and as such, a trial court's ruling on the admission of evidence may only be disturbed upon a showing of an abuse of discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997). For evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence may be excluded by the trial court if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403.

The Tennessee Supreme Court has stated the following with regard to presentation of inconsistent theories:

> We agree that 'prosecutors must not present proof of an historical narrative that they know not to be true[,]' but we also recognize that 'prosecutors are not omniscient.' Just as important, prosecutors are not finders of fact. When a prosecutor has conflicting evidence or simply does not know the truth, he 'is entitled to retain skepticism about the evidence he presents and trust the jury to make the right judgment.' In sum, we think the words of Justice Thomas in his *Bradshaw[v. Stumph]*, 545 U.S. 175, 190 (2005) concurrence apply aptly to this case:
>
>> The Bill of Rights guarantees vigorous adversarial testing of guilt and innocence and conviction only by proof

- 10 -

beyond a reasonable doubt. These guarantees are more than sufficient to deter the State from taking inconsistent positions; a prosecutor who argues inconsistently risks undermining his case, for opposing counsel will bring the conflict to the factfinder's attention.

*State v. Housler*, 193 S.W.3d 476, 493 (Tenn. 2006) (citations omitted). While recognizing that inconsistent theories at separate trials of codefendants may have due process implications, to date, the Tennessee Supreme Court has consistently declined to adopt the rule of *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000), that "core inconsistencies" violate due process. *Berry v. State*, 366 S.W.3d 160, 182 (Tenn. Crim. App. 2011) (citing *Housler*, 193 S.W.3d at 492; *State v. Robinson*, 146 S.W.3d 469, 496 n.12 (Tenn. 2004)). Moreover, in this case, the State did not actually present inconsistent theories. The State did not argue in two separate cases that Defendant was committing two mutually exclusive crimes simultaneously. The crimes were alleged to have occurred approximately one hour apart and within the same county. Defendant is not entitled to relief on this issue.

Additionally, we determine that the trial court properly determined Defendant was not entitled to introduce evidence of his acquittal because it was irrelevant. An acquittal is not evidence of innocence but rather evidence of the failure of the State to prove guilt of a defendant beyond a reasonable doubt. *See* T.C.A. § 39-11-201(a); *State v. Turner*, 352 S.W.3d 425, 430 (Tenn. 2011). Moreover, even if Defendant were actually innocent of the other incident, that fact would not make his guilt in this case more likely or less likely. The trial court did not abuse its discretion. Defendant is not entitled to relief on this issue.

*Evidence of Defendant's Arrest in Alabama*

Next, Defendant argues that the trial court improperly allowed Sergeant Lahr to testify regarding the circumstances of Defendant's arrest in Alabama. Specifically, Defendant insists that Sergeant Lahr lacked personal knowledge and that his testimony was more prejudicial than probative. The State, on the other hand, asserts that Sergeant Lahr's testimony was relevant, not more prejudicial than probative, and was based on his personal knowledge of Defendant's arrest.

Relevant evidence may be excluded by the trial court if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403. Additionally, a witness is not permitted to "testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness'

own testimony." Tenn. R. Evid. 602. The statements of the witness and the surrounding facts and circumstances can be used to infer personal knowledge. *State v. Land*, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000).

Sergeant Lahr's testimony at trial was based upon his direct observations of what he saw and heard on the day that Defendant was arrested in Alabama. Specifically, Sergeant Lahr testified that he was stationed at the back door of the residence and heard a gunshot just prior to being let in the door by the arrest team. Sergeant Lahr stated that he had over thirty-one years of experience with weapons, including ten years in the military. Sergeant Lahr witnessed an officer brandish a Taser while shouting commands at Defendant. He was able to hear a weapon cycling before personally witnessing a struggle between Defendant and the arresting officers. Sergeant Lahr further testified that he had to physically step over Defendant in order to gain access to the upstairs of the apartment. We fail to see how Sergeant Lahr's testimony lacked personal knowledge. The issue of whether the evidence was more prejudicial than probative is a much closer question. However, Defendant's argument on appeal implicitly concedes that the evidence was relevant. The trial court concluded that the details of the gunshot and resisting arrest was probative of Defendant's guilty knowledge that he faced murder charges in Tennessee upon being taken into custody in Alabama. Defendant's argument fails to persuade us that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice. Thus, Defendant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence, arguing that the evidence did not support his convictions for felony murder and attempted especially aggravated robbery. Specifically, Defendant points to the lack of proof of his identity and conflicting testimony from two key witnesses, Ms. Brown and Ms. Jones. The State counters that the evidence overwhelmingly supports the verdicts.

When a defendant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This Court will not reweigh or reevaluate the evidence, nor will this Court substitute its inferences drawn from the

circumstantial evidence for those inferences drawn by the jury. *Id.* Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant was convicted of first degree murder in the perpetration of a robbery and attempted especially aggravated robbery. Especially aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon, and where the victim suffers serious bodily injury. T.C.A. §§ 39-13-401, -403. "Serious bodily injury" means bodily injury that involves: a substantial risk of death, protracted or obvious disfigurement, or a protracted loss or substantial impairment of a function of a bodily member. T.C.A. § 39-11-106(a)(34). A person commits a criminal attempt where, "acting with the kind of culpability otherwise required for the offense," the person acts in one of the following ways:

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believed them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense if the circumstances surrounding the conduct were as the person believed them to be; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a). Felony murder, as applicable in this case, is a killing of another committed in the perpetration of a robbery, with intent to commit the robbery. T.C.A. § 39-13-202(a)(2), and (b).

Looking at the facts in a light most favorable to the State, the proof showed that on August 7, 2012, Mr. Taliaferro came to the victim's apartment and purchased marijuana from the victim. Ms. Jones witnessed the encounter. Shortly thereafter, Defendant entered the house, brandishing a black handgun. Ms. Jones also saw Mr. Taliaferro with a gun. As Ms. Jones left the house through the back door, she heard a gunshot. The gunshot was also heard by Ms. Brown, who saw the victim on the floor and Defendant holding what appeared to be a gun. Defendant grabbed Ms. Brown and asked her where the money was located, indicative of his intent to rob her and/or the victim of property by violence or by putting her in fear. Additionally, both Ms. Jones and Ms. Brown identified Defendant at trial. Mr. Taliaferro's driver's license and fingerprints were found at the scene and a neighborhood juvenile, Jevarious Douglas, saw two men running toward a white Pontiac G6 that was circling the apartment building. Mr. Taliaferro borrowed his girlfriend's white Pontiac G6 on August 7. When Mr. Taliaferro returned the vehicle on August 8, he was accompanied by Defendant. Mr. Taliaferro later admitted during a telephone conversation with Ms. Peeples that he and Defendant committed the crime. Mr. Taliaferro also threatened Ms. Peeples, encouraging her to keep silent about the incident.

The autopsy showed that the victim died of a single gunshot wound and a single spent 9mm shell casing was found at the scene. Even if the jury surmised that Mr. Taliaferro fired the fatal shot, the jury was instructed on criminal responsibility. The jury could have determined that Defendant aided Mr. Taliaferro's commission of the offense with the intent to promote, assist, or benefit in the proceeds of the offense. T.C.A. § 39-11-402(2) (defining criminal responsibility).

Finally, Defendant fled to Phenix City, Alabama, and resisted arrest when he was finally apprehended. Flight from the scene of a crime and evading arrest can be considered as circumstantial evidence of guilt. *See State v. Zagorski*, 701 S.W.2d 808, 813 (Tenn. 1985); *see also Dorantes*, 331 S.W.3d at 388.

Defendant's main complaint with the evidence on appeal is with regard to witness credibility. Essentially, he wants this Court to reweigh the evidence—something we are unable to do. *Bland*, 958 S.W.2d at 659. The jury heard the evidence and resolved any conflicts in favor of the State. The evidence supports their verdict. Defendant is not entitled to relief on this issue.

*Failure to Disclose Jury Note*

Defendant complains that the trial court failed to properly notify him when the jury posed a question during deliberation. Defendant's brief on this issue consists of three sentences, one of which is his argument that "the jurors in the case had a question, and the record establishes that the trial court failed to communicate that to Appellant." The State disagrees and actually insists that the record belies Defendant's allegation.

During our review of the transcript, it appears that at one point during deliberation, the jury reentered the courtroom with a question. The record does not reflect who was present, what was asked, whether the trial court answered the question, or what question was asked. The record only reflects that the jury remained in the courtroom for fifteen minutes, from 7:40 p.m. to 7:55 p.m. The transcript from the hearing on the motion for new trial contains a short conversation about a jury note. During the hearing, the trial court explained that the jury asked a question and the trial court instructed the jury to reread the jury instructions. It is unclear if this is the same situation about which Defendant now complains.

Because it is important to maintain judicial impartiality and fairness in appearance as well as in fact, it is generally considered improper for the trial judge to communicate with jurors off the record and outside the presence of counsel. *See State v. Smith*, 751 S.W.2d 468, 472 (Tenn. Crim. App. 1988); *State v. Mays*, 677 S.W.2d 476, 479 (Tenn. Crim. App. 1984). When such ex parte communications relate to an aspect of the trial, the trial judge should usually disclose the communication to counsel for all parties. *Rushen v. Spain*, 464 U.S. 114, 119 (1983). Generally, ex parte communications by the trial court and the jury are subject to reversal "where a timely complaining party shows specific prejudice, or where, owing to the nature of the ex parte communication, the reviewing court is unable to determine whether the action was actually harmless." *Guy v. Vieth*, 754 S.W.2d 601, 605 (Tenn. 1988). To this end, our supreme court has stated:

> [w]e recognize that there may be times when administrative communications between judge and jury may properly transpire in the absence of counsel, so long as these communications do not contain supplemental instructions relating to the case and are clearly incapable of prejudicing the rights of the parties. In this general category would be communications relating to the jurors' welfare, comforts and physical needs. Such communications must not directly or indirectly refer to the specifics of the case, must be collateral to the issues under consideration, and must not be capable of affecting the deliberative process in any manner.

*Guy*, 754 S.W.2d at 605 (quoting *Truscott v. Chaplin*, 403 F.2d 644, 645 (3d Cir. 1968)). From our review of the record, it is not clear what happened between the jury and the trial

court; therefore, Defendant is unable to show prejudice by the trial court's action. Therefore, Defendant is not entitled to relief on this issue.

*Cumulative Error*

Finally, Defendant asserts that the cumulative effects of multiple errors at trial deprived him of his right to a fair trial. For the reasons set forth above, we cannot agree. Defendant is correct that the cumulative effect of error during trial may operate to deny a defendant of a meaningful, fair trial. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (holding that, in the aggregate, multiple harmless errors committed in trial proceedings may have a cumulative effect on the proceedings so great as to require reversal to preserve a defendant's right to fair trial). However, as discussed above, we have determined that there were no errors in the trial court. Thus, there can be no cumulative effect that deprived the Defendant of a fair, impartial, and meaningful trial.

*CONCLUSION*

After a thorough review of the record, Defendant's convictions are affirmed.


_____
THOMAS T. WOODALL, PRESIDING JUDGE

- 16 -